All right, our second case for this morning is United States v. Belconis. And if we have Mr. Leavitt and Mr. or Ms. Walker on the line, we can proceed. Thank you, Judge. This is Ryan Leavitt. Can you guys hear me all right? I can. Is counsel for the appellee on the line? Yes, this is Grayson Walker. Okay, very good. I actually know women and men by the name of Grayson, so I wasn't sure. Yes, Your Honor. All right, you can proceed, Mr. Leavitt. Thank you. May it please the Court. Myself, along with Damon Charonis, represented David Belconis, the appellant in this matter, both before the trial court and in this appeal. On his behalf, we are asking the Court to vacate his conviction based on the government's constructive amendment of the indictment at trial, and because the evidence was insufficient to sustain a conviction as a matter of law. I'm going to focus my arguments this morning on the issue of the constructive amendment, but I would like to start with a brief word about the sufficiency claim, because in addition to requiring reversal in its own right, I think it helps focus the lens through which this appeal should be viewed. Mr. Belconis is a lawyer who has practiced real estate law in this state since 1986. As every single employee of his that testified at this trial noted, whether they were called by the defense or the government, he is universally well-liked and respected. It was only after a month-long trial where the jury took weeks more to deliberate that it found his two co-defendants guilty of all charges and returned a partial verdict as to Mr. Belconis. This is one of those instances, we would submit, where the jury got it wrong and the sufficiency of the evidence reflects that. The district court itself observed, in its order denying his Rule 29 challenge, that he presents, quote, a closer case than his co-defendants. I hope the Court keeps that in mind as it assesses the issues we've raised, but in any event, I'm going to turn to the constructive amendment argument. As I said from the outset, we submit that the government constructively amended the indictment, both through its evidence and the argument to present at the trial. This is reversible error. Excuse me, Mr. Levin. When you raised this at the trial, the district court rejected your point, among other things, citing 18 U.S.C. Section 2 and saying that the government in an indictment doesn't actually have to cite to Section 2 in order for it to be understood. It sort of defines the scope of liability. So whether Mr. Belconis was doing various things personally or through an agent, the court said, shouldn't matter. So perhaps you could explain why that was wrong in your view. Sure. I think the importance is asking is we have to ask what it is specifically we look at when we look at whether or not a constructive amendment occurred. And one of the things I think the district court argued, not just in relation to whether or not the federal statute regarding principal agent liability was cited, but it took the position that the charge itself has to be amended. But I think there's a lot of law, both from the Supreme Court and in this circuit, that says constructive amendments are broader than that. And one of the things you look at is certainly what was presented for the grand jury, what was presented at trial, both in terms of the evidence and the arguments of the parties, and, well, not really applicable in this case, what instructions were given. So whether or not Section 2 was cited is certainly one relevant consideration because that affects what the nature of the evidence in charge was that was, in fact, presented to the grand jury. But as I was sort of hinting at. But I'm looking at your brief. I'm looking at what is page 27 of your brief. You say, specifically, the defense argued that the government constructively amended the indictment by broadening his theory of culpability from Mr. Balcones to no longer include his direct performance of acts such as notarizing false mortgage documents, but to shift theories mid-trial and argue that he was responsible for the acts of others under a principal agent theory. So that looks to me, I'm sitting here looking at Section 2, it looks to me as exactly the sort of thing Section 2 says. That's already understood to be part of the offense. And so whether there was sufficient evidence to show that he directed other people or the rest of it, I can understand that as a sufficiency argument. But as a constructive amendment of the indictment argument, it seems to me that it runs into some trouble. I understand Your Honor's point. I think part of the point about the indictment was that actually before the trial court, we raised Section 2 as a point supporting the fact that it wasn't necessarily raised in all of the different statutes. And when you look at the indictment itself, I mean, this was a whale of an indictment. To call it a speaking indictment would be an understatement. I think the scheme itself was set out in at least if not more than 45 different paragraphs. And the centerpiece of that indictment and what the theory of conviction was for Mr. Belkonis was that he notarized, and when you notarize, you stamp and also sign below it, he notarized and signed these false and fraudulent documents. And that goes to how he participated in the scheme, which of course is knowing participation being an essential element, and also the government's theory as to how he formed the intent to defraud. And so basically right before trial, as new information develops regarding his employee, Rodda Hanson, and the government's theory winds up shifting at trial, which in any event there was a disconnect between the grand jury and the trial jury and what they heard in terms of the government's theory of conviction. It was no doubt different. And I think following Leibniz, the real question we have to ask is whether or not that theory is broader or not. And if it's broader, it's a constructive amendment. One of the other points sort of related to this discussion I think is worth emphasizing is that the district court itself didn't really say one way or the other, either when it orally denied the motion or in its post-trial order. But I think there is certainly a suggestion there from the district court itself that this is a case where it did in fact find a variance between what was presented in the indictment to the grand jury and what was presented at trial. If you look at the fact that after it denied the motion, it in fact reconsidered its position regarding 7th Circuit Pattern Instruction 5.02, the instruction regarding corporate principal agent liability. And it also, in any event, I just think that's also relevant to thinking through the questions you raised, Judge Wood. One other point I'd like to bring up too, I think, that the district court also relied on and cited, that I certainly think bears further mention, is the point about the executions of the scheme to defraud and what counts Mr. Balcones was actually convicted of versus what counts the mistrial was declared for. Because it was in fact other counts that he was convicted on that didn't pertain directly to, that didn't seem to, for closings, that didn't involve the documents at issue, right? And that's something the district court specifically relied on, highlighting it in a footnote of its opinion. And the government certainly emphasized and echoed to a large extent in its response. But I want to just emphasize, as we did in our reply, that I think this court is well aware of the minimal requirements of what actually has to be proven and what an execution as charged in any given count of an indictment of a scheme to defraud, in fact, is, right? And it's just that the wire or mailing for those specific counts just have to be essentially reasonably foreseeable as an outgrowth of the scheme to any given defendant. They don't go back to the elements and what the theory of conviction is, which, by the way, looking technically at the indictment, the scheme itself was in fact reincorporated expressly by the government in every single one of those counts, including in all of the counts of conviction. So maybe it would be helpful if you looked at these. I mean, of course, this jury does sift for Mr. Belkanas. It acquits on certain charges more than actually convicted on. And it drew the inference from the involvement of this American Dream Bank account that he was aware that there were misrepresentations about who was providing the funds, you know, for example, for down payments. And I'm not saying a jury had to draw that inference, but why was it not a permissible inference to draw? I'm sorry, Judge Wood. I didn't catch the beginning of what you said. Oh, I'm sorry. I'm saying focusing in on the actual counts of conviction, which, of course, was a subset of the charges, as you noted, I was just saying why isn't this, even if not maybe the strongest case in the world, one where the jury was entitled to draw an inference from the checks drawn on the American Dream Bank account that Mr. Belkanas was aware that the down payment was not coming from the source that the papers showed it to be coming from, that there was a misrepresentation. I understand your question. I think the answer to it is, you know, going back to what I was sort of saying earlier about what it is and what can, in fact, constitute a constructive amendment of the indictment, is the evidence at trial, right? And when you look at the evidence on the issue of the American Dream and whether or not he knew the source of it, and what you're specifically referring to is those counts that weren't closings that didn't occur at his title company, but that he acted as the buyer attorney for his co-defendant Karen Ganser for. Those closings took place at Chicago Title, and when you look at the government's case, there was an individual named Mr. Wagner who testified on behalf of Chicago Title and talked about the process through which that information about American Dream would have wound up on the HUD-1 settlement statement. And just to paraphrase it, it's certainly, you know, the facts are set on a brief, but he said the buyer's attorney would have no involvement in that. And so when we look at what the actual evidence was and what the government's theory of conviction was, that's where, you know, Mr. Balcones falsely notarizing or notarizing these false documents was, in fact, the centerpiece. And because that theory shifted more broadly, a constructive amendment occurred. All right, you're down to about three minutes if you want to save any time. Yeah, I was just about to say that if there's no other questions, I would very much appreciate that. Thank you, Your Honor. Certainly. Mr. Walker. May it please the Court, Grayson Walker for the United States. There was ample evidence at trial to support the jury's verdict that David Balcones knowingly participated in a mortgage fraud scheme and executed that scheme at real estate closings for buyers Karen Ganser and Ty Lee. Balcones challenges the sufficiency of the government's evidence, largely echoing arguments that he made in closing with respect to the counts of conviction. A properly instructed jury considered and reasonably rejected those arguments and returned guilty verdicts on five counts. That verdict should stand. So, Mr. Walker, I should have probably raised this with Mr. Levitt as well, but it's my recollection, but please correct me if I'm wrong, that there were no fights about the jury instructions on these points. Is that correct? That's correct, Judge, and Mr. Balcones is certainly not challenging any instructions on appeal here. The trial evidence established that Balcones was a knowing participant in this scheme, and that knowledge evidence came in several forms. The jury heard testimony from condo buyers Robert and Mary Jo Neils that Balcones placed them under what they described as a gag order at a closing where they started to discuss their anticipation of a down payment refund. Balcones later admitted to law enforcement that he knew those buyers had received undisclosed financial incentives. It was reasonable for the jury to conclude that only a knowing participant in the scheme would place that kind of gag order on buyers who were about to disclose a fact that would have revealed the scheme to the lender. It seems like a lot of weight to place on a quick comment. Don't talk about that here. I don't know. It seems like a thin reed here for your case. If that were the government's only evidence, Your Honor, I would agree, but there was more with respect to Balcones. The jury also heard evidence about the subset of closings that occurred at Balcones' title company, 19 out of 254, and the smallness of that number is in itself incriminating when you look at the deals on that list. They involved closings for the lead schemer, Vince Manglardi's wife, his college-aged daughter, the college-aged daughter of his mistress, an employee at the Woods who received down payment checks directly from Manglardi, and the Ty Lee closings, which are two of the counts of conviction, also took place at Classic Title. They're on that list of Vince deals. So the incriminating inference to be drawn from that list is really based on the list of 19 deals considered as a whole and does not turn on whether there was sufficient evidence to convict Balcones of executing the scheme as to any particular straw buyer closing. The jury also heard evidence that in 2014 Balcones reached out to a former employee and instructed her that if asked, she should say that Manglardi's mistress' college-aged daughter was present for those closings back in 2007. So there was evidence that Balcones was trying to get the story straight on what happened at those highly suspicious Vince deals, again, only 19 out of 254. Turning directly to the counts of conviction, three of them relate to a power of attorney closing for Karen Ganser in December of 2007. There is no dispute that David Balcones was at that closing. There is no dispute about the authenticity of his signatures on the relevant documents. And the key knowledge evidence with respect to those counts of conviction is an email that Balcones received addressed to him hours before the closing in which he learned that American Dream had wired the down payment funds for the Ganser closings to the title company. And he received instructions to have a certain portion of those down payment funds wired back to an American Dream bank account. At trial, Balcones argued strenuously that he neither read nor understood that email. The jury was entitled to draw a conclusion otherwise, and that conclusion was reasonable. The email was addressed to Balcones. It concerned a matter pertaining to his law practice, not his title insurance company. And the instructions contained in that email about where to return the surplus funds were executed. That deal was fraudulent on its face. The loan application and settlement statement falsely stated that Karen Ganser's down payment funds were coming from a checking or savings account, but Balcones well knew from that email that Karen Ganser's down payment funds had come from a third-party entity, American Dream. On the other two counts of conviction as to Ty Lee, these deals were also fraudulent on their face. The down payment check presented came from American Dream, yet Lee stated that his employer was Motorola, and he was providing a down payment from checking and savings. These deals were on the list of 19 Vince deals closed at Classic Title because they needed two layers of protection. Balcones acting as both buyer's attorney per the settlement statement and closing the deal at his title company because any neutral settlement agent or buyer's attorney outside of the scheme would have looked at the facial contradiction in these documents and scuttled the deal. As to the constructive amendment argument, as the district court accurately pointed out in its ruling on post-trial motions, the dispute about theories of direct versus indirect liability pertained to straw buyer counts on which the jury did not return a unanimous verdict. They do not relate to the five counts of conviction at issue here. As I said, there is no dispute that Balcones attended the Karen Ganser closing and signed the relevant documents. And in the case of the Ty Lee closing, the government never alleged that Balcones personally signed or notarized any of those false documents. Instead, he was functioning as the buyer's attorney on that occasion and arranged for the closing to take place at Classic Title because of its obviously fraudulent nature. In any event, as Judge Wood pointed out earlier, theories of direct and indirect liability do not change the nature of the crime charged here. The indictment in paragraph 35 contained allegations that were broad enough to encompass a theory of indirect liability. To the extent Balcones is complaining about a variance here that surprised him about the government's theory of conviction on the straw buyer counts, again on which the jury did not return a unanimous verdict, Balcones both anticipated and attempted to rebut the theory of indirect liability throughout trial. And on the six straw buyer counts that he contested very vigorously relating to this theory of indirect liability, the jury did not return a unanimous verdict. Pending any questions from the court, the government respectfully requests that the judgment against David Balcones be affirmed. All right. I hear no questions. And so we will thank you, Mr. Walker, and ask Mr. Levitt if he has anything further. Thank you, Your Honor. Yes, I do. I would need an hour to go through the sufficiency points. We're not giving you an hour. I understand. I'm just going to go back to your point about Title 18, Section 2 of the United States Code. I just want to point out, you know, I went back and pulled up the indictment real quick while listening to Mr. Walker, and it's just worth observing that Section 2 was not cited in any of the fraud counts, if I'm not mistaken. It was only cited in the false statement count. So at least in terms of considering whether the fraud itself was a constructive amendment, that is certainly a relevant consideration. Could you explain to me why you think that there's continuing relevance of things that pertained to the counts on which Mr. Balcones was acquitted? Whether there's continuing what? I'm sorry. Relevance. I mean, why do we care if he was acquitted on these accounts? Well, because it goes to the point I was mentioning about the executions judge. Every single count of the indictment realleged the entire scheme to defraud, and when we're talking about what the crime he was convicted of, it's improper for the government to now try to get away from what the scheme itself was, because in every one of those supposed straw buyer counts that it keeps referring to, that scheme was realleged, and the centerpiece of Mr. Balcones' involvement in this scheme was notarizing and signing false documents in relation to these closings. So to change their theory with regard to something of such evidentiary significance, that's a constructive amendment, and it doesn't matter whether it changes the evidence or it changes the nature of the crime itself or it's the same scheme. I think this court's precedent,  it's not the crime itself that matters. It's the elements in this given defendant and what is the evidence to establish the proof of those elements and is there a divergence between those things, between what the grand jury hears and what the trial jury hears, and if it's broader in the latter situation, that's a constructive amendment and that's reversible error. But you didn't object anywhere in this region to the jury instructions, right? As far as you were concerned, the jury got appropriate instructions on the elements of the offenses. Correct, Judge. That's right. There were, as best I recall, I mean, there were a few, but none I think directly pertinent to the issues we're raising here. Okay. So with that, if there are no other questions, I very much thank the court for its time this morning and ask that it vacate in reverse Mr. Balcones' conviction. All right. Thank you very much then. Thanks to both counsel and we will take this case under advisement.